

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00226-CR
### NO. 02-16-00227-CR
### NO. 02-16-00228-CR

THE STATE OF TEXAS                                                    STATE

V.

TERRI SANDERS                                                      APPELLEE

----------

FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
TRIAL COURT NOS. 2015-0255M-CR, 2015-0256M-CR, 2015-0257M-CR

----------

## DISSENTING OPINION

----------

### PROCEDURAL HISTORY

Terri Donnell Sanders was indicted in Montague County, Texas, on two charges of Intoxication Manslaughter and on one charge of Intoxication Assault. The trial court granted Sanders's motion to suppress and filed Findings of Fact and Conclusions of Law. The State appealed.

We review a trial court's ruling on a motion to suppress for an abuse of discretion.[1] We will review the appellate record in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or outside the zone of reasonable disagreement.[2] We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case.[3] We afford a trial court's ruling almost total deference as to historical facts but review the trial court's application of the law to the facts de novo.[4] In this case, we review de novo the trial court's application of the law of search and seizure to the facts.[5]

The State, relying on *Cole*,[6] argued the warrantless blood draw was justified by exigent circumstances, that is, the imminent destruction of evidence.

---

[1] *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).

[2] *Montgomery v. State*, 810 S.W.2d 372, 391–92 (Tex. Crim. App. 1991) (op. on reh'g).

[3] *See Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

[4] *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016).

[5] *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *see State v. Villarreal*, 475 S.W.3d 784, 798 (Tex. Crim. App. 2014) ("[B]ecause the facts are undisputed and the questions before us are matters of law, we apply a *de novo* standard of review."), *cert. denied*, 136 S. Ct. 2544 (2016); *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004) ("On appeal, the question of whether a specific search or seizure is 'reasonable' under the Fourth Amendment is subject to *de novo* review. Despite its fact-sensitive analysis, 'reasonableness' is ultimately a question of substantive Fourth Amendment law." (footnotes omitted.)).

[6] *Cole*, 490 S.W.3d at 927.

It argued the medical intervention at the hospital caused Trooper Brandon Neff to believe the blood test's efficacy would be significantly undermined.

Sanders, relying on *Weems*,[7] responded that law enforcement knew that a mandatory blood draw would be required before leaving the accident scene for the hospital and complained that Trooper Neff did nothing to obtain a warrant.

The majority concludes that because Trooper Rachel Russell told Trooper Neff at the scene she believed Sanders was intoxicated, because both officers detected signs of intoxication, and because Sanders said she had consumed alcohol earlier, Trooper Neff had a duty to obtain a warrant at the scene but failed to do so. In holding the State did not prove exigent circumstances, the majority emphasizes the availability of other officers to obtain a warrant, the personal mistaken belief of the officer that no warrant was required, and the lack of evidence about the warrant process and access to a magistrate at the crash scene. However, the majority does not address the emergency medical intervention as exigent circumstances. Because I conclude the blood draw was justified by exigent circumstances, I respectfully dissent.

## ANALYSIS

In order to validate a warrantless search based on exigent circumstances, the State must establish probable cause and an exigency.[8] We should,

---

[7]*Weems v. State*, 493 S.W.3d 574, 582 (Tex. Crim. App. 2016).

[8]The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

therefore, accurately examine the relevant facts as to both probable cause and exigent circumstances and properly apply the law.

## PROBABLE CAUSE

**FACTS**

First, as to probable cause, our review should be limited to only those critical facts relevant to probable cause. And we should ask whether, viewing the totality of the facts from the standpoint of an objectively reasonable police officer, Trooper Neff's knowledge amounted to sufficient probable cause at the time of the search.

The record shows that starting at about 12:07 a.m., Trooper Russell, the lead investigator, arrived at the crash scene on a two-lane road and initially met with Sanders, who had driven her eastbound vehicle in the westbound lane, resulting in a head-on collision. Sanders was found sitting in her boyfriend's pickup. Minutes later, Trooper Russell told Trooper Neff about signs she had observed (odor of alcohol, bloodshot eyes, slurred speech, and Sanders's statement she had consumed alcohol earlier) and instructed him to "to perform field sobriety on her and if need be, to get a specimen from her." The record shows, however, that Trooper Russell *did not* convey to Trooper Neff any opinion

---

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This discussion is obviously limited to a blood draw. The Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving. *Birchfield v. N. Dakota*, 136 S. Ct. 2160, 2184 (2016).

4

Sanders was intoxicated. Trooper Russell left the probable cause determination strictly up to Trooper Neff.

Trooper Neff met with Sanders and observed similar signs of intoxication, as well as unsteady balance when she walked. He interviewed her about what had happened and where she was going, requested she get out of her boyfriend's pickup truck and walk to the squad car, qualified her as to her capacity to be field tested, inquired about her health (she insisted several times she was fine), and explained in detail all three field sobriety tests. But when Trooper Neff actually raised his hand to begin the HGN test, Sanders's boyfriend interrupted the test and asked that paramedics reexamine her. Sanders decided to be taken by ambulance to the hospital. These exchanges occurred continuously from approximately 12:07 a.m. until about 12:55 a.m.

Trooper Neff followed the ambulance to the hospital, which was approximately five minutes away, out of concern Sanders would flee because of what she had done and so that he could continue the HGN test. He completed the HGN test in the emergency room.[9]

Based upon the signs of intoxication observed at the scene and Sanders's "mannerisms" and poor performance on the HGN test at the hospital, Trooper

_____

[9]The trial court's findings of fact stated that "[t]he HGN test was never completed," which the State and Sanders interpreted as meaning the test was never completed at the scene. However, Trooper Neff testified about how he asked Sanders to consent to proceed with the test at the hospital, how he completed it there, and how it factored into his determination of probable cause. The parties relied on this testimony on appeal. The majority does not mention it.

5

Neff testified he had enough facts to believe Sanders was intoxicated and did not have her mental or physical capabilities to operate a vehicle. He read her rights to her, asked for a blood sample, and she refused.

**ANALYSIS OF PROBABLE CAUSE**

Probable cause necessitates a review of all the events which occurred leading up to the search, that is, the sum total of the layers of information, not just individual layers of information or selected portions of the evidence.[10] A proper *probable cause analysis* involves the following factors:

---

[10]Probable cause must exist at the time of the search. Probable cause to search exists when reasonably trustworthy facts and circumstances *within the officer's knowledge at the scene* and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable prudence and caution to believe an offense has been or is being committed or the instrumentality of a crime or evidence of a crime will be found. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 2332–33 (1983); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S. Ct. 1302, 1310–11 (1949); *Carroll v. United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 288 (1925); *Estrada v. State*, 154 S.W.3d 604, 609 (Tex. Crim. App. 2005). Probable cause, as the name implies, deals with probabilities, that is, "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar*, 338 U.S. at 175, 69 S. Ct. at 1310. The substance of all probable-cause definitions is a reasonable ground for belief of guilt. *Id.*, 69 S. Ct. at 1310. The constitutional validity of an arrest or search turns upon whether, "at the moment" the arrest or search was made, the officers had probable cause to make it. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964) (citing *Henry v. United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 171 (1959); *Brinegar*, 338 U.S. at 175–76, 69 S Ct. at 1310–11); *Parker v. State*, 206 S.W.3d 593, 596–97 (Tex. Crim. App. 2006). Probable cause focuses on the knowledge of the officer at the scene at the moment of the arrest or search. *Parker*, 206 S.W.3d at 596–97. The standard for probable cause is not capable of precise definition or quantification into percentages. In determining probable cause, the appellate court will consider the totality of the circumstances. A "divide-and-conquer" or piecemeal approach is prohibited. The training, knowledge, and experience of law enforcement officials is a relevant consideration. *United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S. Ct. 744, 750–51 (2002); *Texas v. Brown*, 460 U.S. 730,

- Whether the reasonably trustworthy facts and circumstances *within the officer's knowledge at the scene* and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable prudence and caution to believe an offense has been or is being committed or the instrumentality of a crime or evidence of a crime will be found;

- A review of the totality of all the circumstances (all of the events which occurred leading up to the arrest or search; the sum total of layers of information, not just individual layers); and

742–43, 103 S. Ct. 1535, 1543–44 (1983); *United States v. McSween*, 53 F.3d 684, 686 (5th Cir.), *cert. denied*, 516 U.S. 874 (1995); *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). The subjective intent or motivations of law enforcement officials is not taken into account when considering the totality of the circumstances. "[P]robable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total." *Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966), *cert. denied*, 386 U.S. 1008 (1967); *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991), *abrogated in part on other grounds by Turrubiate v. State*, 399 S.W.3d 147 (Tex. Crim. App. 2013) (adhering to the general rule that a landlord cannot normally give effective consent to allow a search of a tenant's premises); *Woodward v. State*, 668 S.W.2d 337, 345 (Tex. Crim. App. 1982) (op. on reh'g), *cert. denied*, 469 U.S. 1181 (1985); *see Brinegar*, 338 U.S. at 176, 69 S. Ct. at 1311. In determining whether an officer has probable cause to arrest an individual, the court must examine the "events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,'" amount to sufficient probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 800 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 1661–62 (1996)); see *Brinegar*, 338 U.S. at 175–76, 69 S. Ct. at 1310–11. It is well settled that probable cause must exist at the moment the arrest or search is made, based on the arresting officer's knowledge, considering the totality of the circumstances facing the arresting officer. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

- Viewed from the standpoint of an objectively reasonable police officer at the scene at the moment of the arrest or search considering the officer's training, knowledge, and experience.

Thus, the circumstances must be viewed from the standpoint of Trooper Neff, an objectively reasonable police officer whose training, knowledge, and experience spanned almost eighteen years.[11]  And the circumstances must be viewed at the moment of the search at the hospital.  The record shows that only

_____

[11]Trooper Neff knew that Sanders had been involved in a head-on collision with possible ramifications affecting her eyes, speech, and coordination, as well as other possible injuries, and that two persons had died in the collision.  It is reasonable to assume this officer realized the importance and potential ramifications of his investigation and the significance of independent confirmation of his observations.  An experienced officer would be aware that facts which initially suggest strong probable cause and equally strong evidence of guilt may subsequently prove substantially less persuasive or even marginally important.  Officers have a variety of legitimate reasons for pursuing an investigation.  In any given case, the facts may be egregious or sensitive, lives lost, the degree of devastation may be serious, and the facts supporting probable cause arguably strong, fairly routine, marginal, or unsettled.  At the same time, police officers have no constitutional duty to stop a criminal investigation the moment they have the minimum evidence to establish probable cause.

Sanders had the odor of alcohol about her person and she eventually admitted drinking earlier, but there was no evidence that odor would reflect the quantity of alcohol consumed, and she never stated how much or when she consumed the alcohol.  Her eyes were bloodshot, her speech slurred, and her walk unsteady, but the record showed it was midnight, she had driven a long distance, and she had been involved in a serious head-on collision.  At the fatal crash scene, Sanders was asked how she felt, and she repeatedly assured officers she was fine.  Yet almost immediately thereafter, in the ambulance, the hospital, or both, it was determined she had broken bones in her ankle and possibly in her ribs.  Thus, several conditions observed and believed to be indicative of intoxication were immediately dispelled by the injuries she suffered.  An experienced police officer like Trooper Neff would be expected to anticipate such potential developments.  The record shows Trooper Neff tenaciously pursued his assignment of interviewing and independently testing Sanders in order to determine if probable cause existed.

8

at the time of the search at the hospital did Trooper Neff determine he had reasonably trustworthy facts to warrant him to believe Sanders was driving while intoxicated.

Based on these facts, the State established probable cause following the administering of the HGN test at the hospital. Only after probable cause was established did the officer have a duty to obtain a warrant.

What is troubling is that the majority reviewed the initial signs of intoxication observed by the officers and holds Trooper Neff had a duty to obtain a warrant immediately after arrival at the crash scene. The majority then abruptly turns its attention to discussing its reasons why the State had failed to establish an exigency.[12] The complete absence of any mention of probable cause is a serious flaw in the majority's analysis; it skipped a critical step. What justification exists for the failure to discuss probable cause, a factor critical to evaluating Trooper Neff's conduct at the crash scene, a factor critical to supporting a warrant, and a factor critical to triggering any duty to obtain a warrant? Even Sanders did not challenge that the officer found probable cause after completing the HGN test at the hospital.

As a general rule, a probable cause review encompasses an examination by the court of the totality of the circumstances at the time of the search from the

---

[12]The majority stated no exigency had been shown because of the availability of other officers to obtain a warrant, Trooper Neff's mistaken belief about the necessity of a warrant, and the lack of evidence as to procedures and a magistrate.

vantage point of the officer. A probable cause review does not anticipate that a court will retroactively isolate selected facts developed during the preliminary stages of an investigation, when the officers are still in the midst of conducting a probable cause investigation and have not made such an assessment.[13] If a court finds no probable cause after this accelerated evaluation, that finding would result in the exclusion of evidence. If a court finds probable cause, at least impliedly as in this case, that finding would result, not in the per se exclusion of evidence, but in prematurely creating a duty of the officer to obtain a warrant, failing which the evidence would be subject to exclusion (the result reached by the majority in this case). [14] I believe the majority's analysis intrudes upon the law enforcement investigative function by substituting the majority's judgment for that of the officers, with the result that it prematurely triggers the officers' "duty" to obtain a warrant. The majority's holding sets a precedent that will encourage other defendants to claim the officer did not find probable cause early enough in the investigative stage and which will ultimately require the exclusion of evidence because the court second-guesses the timing of the probable cause

---

[13]Sanders acknowledged at the pretrial hearing and on appeal that the police investigation into probable cause was ongoing when Sanders was taken to the hospital.

[14]The majority never expressly holds probable cause was established immediately after the officers' arrival at the crash scene when they contacted Sanders and observed signs of intoxication. Instead, the majority discusses segments of the *Weems* and *Cole* decisions which did involve determinations of probable cause.

10

determination.[15]  In addition, the  majority introduces a high degree of uncertainty into criminal investigations, as officers, concerned that the courts may again second-guess the timing of their probable cause determinations, may shortcut investigations to their prejudice.

An objective review of the facts and a proper application of the law concerning probable cause show Trooper Neff conducted a legitimate

---

[15]There is little difference between this legal two-step, arguing probable cause should have been found earlier so Sanders can claim that the blood sample is inadmissible, and a defendant arguing he should have been arrested before he actually was, so he can claim certain statements were inadmissible. Police officers have no constitutional duty to stop a criminal investigation the moment they have the minimum evidence to establish probable cause.  "Faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution."  *Kentucky v. King*, 563 U.S. 452, 467, 131 S. Ct. 1849, 1861 (2011); *Turrubiate*, 399 S.W.3d at 152.  The police may want to resolve the matter with a short conversation or seek consent for the search.  The police may wish to obtain more evidence rather than rely upon a marginal case.  In *Hoffa v. United States*, the appellant argued that his statements were inadmissible because the government had sufficient ground for taking him into custody and charging him with endeavors to tamper with a jury.  Had the government done so, however, it could not have continued to question the appellant without observance of his Sixth Amendment right to counsel.  The Supreme Court disposed of this contention as follows:

> There is no constitutional right to be arrested.  The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long.  Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Hoffa v. United States*, 385 U.S. 293, 310, 87 S. Ct. 408, 417 (1966); *see also United States v. Galberth*, 846 F.2d 983, 993 n.18 (5th Cir.), *cert. denied*, 488 U.S. 865 (1988).

investigation of Sanders at the crash scene and at the hospital which ultimately resulted in the officer's probable cause determination. Only after his investigation was complete did Trooper Neff believe he had sufficient facts to establish probable cause and a duty to seek a warrant. Trooper Neff followed standard procedure in observing and verifying. This court should follow the traditional practice of applying the law of probable cause and hold that Trooper Neff properly determined he had probable cause after completion of the sobriety testing at the hospital and that only then did he have a duty to obtain a warrant, rather than interfering with the police investigative functions, second-guessing standard police practices, and adversely affecting future criminal prosecutions.

## EXIGENT CIRCUMSTANCES

**FACTS**

Next, as to exigent circumstances, the record shows the following relevant facts. A 911 call advised police of a two-car collision on Highway 82. Trooper Russell, lead investigator, immediately proceeded to the location, arriving about 12:07 a.m., and saw that the first responders, comprised of firemen, emergency medical personnel, volunteers, and peace officers, were not doing "a whole lot" other than gathering information and controlling traffic; no one was conducting an accident investigation, as that was her job.

Trooper Russell immediately took charge and assigned the peace officers specific assignments during the investigation: Trooper Russell was in charge of the entire crime scene and very briefly interviewed Sanders; then Trooper Neff

12

was assigned to deal with Sanders; Deputy Lee Phariss was to paint the crime scene; Sergeant David Hanks and also other officers were in charge of controlling traffic east and west; Game Warden Chase McAninch was to fill out a major crash packet; Sergeant James Taylor, who arrived later, was to take photos at the crime scene; and Trooper Charles Hardin, from two counties away, was assigned to contact the families of the decedents.

The remainder of the responders were not investigators capable of getting a warrant or blood samples. Within subsequent weeks, Trooper Russell obtained the names of seven paramedics and fourteen firefighters who attended to various medical needs or attended to the damaged vehicles; none were peace officers or DWI investigators.

Trooper Russell was advised Sanders had declined medical treatment by paramedics. Trooper Russell visited briefly with Sanders and delegated to Trooper Neff full responsibility to interview Sanders and obtain a blood sample if appropriate, and she proceeded to manage the crash scene investigation, gather information, and hand out specific assignments to the seven officers present. According to Trooper Russell, the justice of the peace arrived after Sanders had been transported by ambulance to the hospital. The judge pronounced the two occupants of the second vehicle deceased at 12:40 a.m.[16] Trooper Russell did not discuss drawing Sanders's blood with the judge.

---

[16]In an effort to reconcile differing times, Trooper Russell opined Sanders may have been in the ambulance at the scene and she, therefore, did not realize Sanders had not left yet.

13

With respect to a search warrant, Trooper Russell testified she did not have the time nor the opportunity to obtain one because of her investigative responsibilities, that she left the decision as to a search warrant up to Trooper Neff, that the other officers were engaged with their assignments, and that no other officer went with Trooper Neff to the hospital. Trooper Russell did not believe Sanders was present when the judge arrived.

Trooper Neff described in detail his law enforcement background, his contact with and conversations with Sanders, his observations about the signs of intoxication observed, his explanations regarding the field sobriety tests, and Sanders's decision to go to the hospital when he began the first test. Trooper Neff believed Clint Mahan, Sanders's boyfriend, was trying to frustrate testing for alcohol. Trooper Neff stated the ambulance left the scene before the justice of the peace arrived. Trooper Neff followed the ambulance to the hospital and immediately advised Mahan not to further interfere; Mahan complied. Sanders was wheeled on a gurney into an examination room in the emergency area, and Trooper Neff accompanied her. The room was a scene of crowded activity. Trooper Neff immediately administered the HGN test, read her the DIC 24 form reciting her rights and options for several minutes, and asked for her consent for a blood test. She refused. He also filled out and signed the THP 51, the mandatory blood specimen form authorizing the blood draw.

From the moment of his entry into the emergency room, Trooper Neff described it as a "beehive" of activity. He testified that at this time, medical

14

personnel were running around doing things and that they began to "put up the pole and [bring in] fluid bags" and lay out needles, wipes, and blood kits on the counter. He became concerned about obtaining a blood sample because Sanders had begun to complain about pain. The officer said that he thought the medical personnel were about to take immediate action to start administering substances to help Sanders and that he needed to obtain a blood sample prior to what they were doing because otherwise the blood test would be a "lower or less accurate" sample.[17] Trooper Neff testified as to his education, training, and experience as a blood test operator and stated he believed the saline solution in the IV, the alcohol wipe, and the body's metabolism would alter Sanders's blood chemistry and affect the blood alcohol concentration and thus the outcome of the blood test. Under all the circumstances, Trooper Neff did not believe he had time to secure a search warrant at the hospital and believed he was acting under exigent circumstances. He, therefore, requested a blood draw. According to the THP 51, entered at trial without objection, blood was drawn at 1:24 a.m.

Trooper Neff stated he had search warrant forms with him but did not have time to fill them out prior to medical personnel pushing him "out of the way." There was no one else available to assist him. Trooper Neff said he was aware of rulings in appellate cases requiring a warrant for a blood draw. He also said

---

[17]The prosecutor asked, "They're going to start pumping her full of stuff?" Trooper Neff agreed by saying, "Yes, sir."

15

he believed that the law permitted a warrantless blood draw when a person died in an accident.

Trooper Neff testified that he did not get a warrant before the blood draw at the hospital for the following reasons: (1) the dissipation of alcohol in Sanders's bloodstream; (2) exigent circumstances, as emergency medical treatment was about to begin, which would adversely affect the blood draw, leaving him no time to get a warrant; and (3) the law allowed him to get a warrant or do a warrantless blood draw when someone had died in the accident. The trial court granted Sanders's motion to suppress and entered findings of fact and conclusions of law.[18] The trial court concluded as a matter of law the state did not prove exigent circumstances.

---

[18]In its findings of fact, the court stated in part that at the hospital, warnings were read to Sanders, who refused consent for a blood sample. Trooper Neff observed medical personnel setting up needles, tubes, and bags of fluid for injection into Sanders and believed such would interfere with the accuracy of a blood test; he also believed the law permitted a blood test without a search warrant. Under all the circumstances, the officer did not believe he had time to secure a search warrant before treatment and fluid injection began. The officer, therefore, requested medical personnel to draw a blood sample. The trial court's conclusions of law stated that no attempt was made to contact a magistrate and that Trooper Neff possessed a search warrant form. Further, the trial court concluded the "State produced no evidence to show that the destruction of [Sanders's] blood alcohol was imminent or that the reliability of later analysis of the blood drawn would be affected by liquid injections given by hospital personnel" and more specifically that "the State produced no evidence as to the basis for the Trooper's belief that destruction of evidence was imminent; nor is there evidence as to the nature of the medical treatment at hand and as to why it might or would result in destruction of evidence." The court added that it was "left to surmise that some unspecified prospective treatment would have such effect."

16

## ANALYSIS OF EXIGENT CIRCUMSTANCES

To satisfy the exigent-circumstances exception, an exigency that requires immediate action must exist. One category of exigent circumstances that justifies a warrantless intrusion by police officers is preventing the destruction of evidence or contraband. A *proper exigency analysis* involves the following factors:[19]

---

[19]An exigency potentially provides for a reasonable, yet warrantless search because "there is compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 569 U.S. 141, 149, 133 S. Ct 1552, 1559, 1568 (2013). "[R]easonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" and allowances must be made based on the fact that "'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Ryburn v. Huff*, 565 U.S. 469, 477, 132 S. Ct. 987, 992 (2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1872 (1989)). Whether law enforcement faced an emergency that justifies acting without a warrant calls for a case-by-case determination based on the totality of circumstances. *McNeely*, 569 U.S. at 149–50,133 S. Ct at 1559. "[A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation." *Cole*, 490 S.W.3d at 923 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2413 (1978)). An exigency analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search. *Id.* "The relevant inquiry is whether, given the facts . . . known to police at the time, it would be objectively reasonable for an officer to conclude that taking the time necessary to obtain a warrant before drawing a blood sample would significantly undermine the efficacy of a blood alcohol test." *Douds v. State*, 434 S.W.3d 842, 854 (Tex. App.—Houston [14th Dist.] 2014) (op. on reh'g en banc), *rev'd on other grounds*, 472 S.W.3d 670 (Tex. Crim. App. 2015) (holding defendant failed to preserve error), *cert. denied*, 136 S. Ct. 1461 (2016); *see McNeely*, 569 U.S. at 152, 133 S. Ct. at 1561; *Schmerber v. California*, 384 U.S. 757, 770, 86 S. Ct. 1826, 1835 (1966); *Parker*, 206 S.W.3d at 600 ("[T]he determination of whether an officer has probable cause and exigent circumstances to enter a person's home without a warrant is a factual one based on the sum of all the information known to the officer at the time of entry."); *Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998) ("We apply an objective standard of reasonableness in determining whether a warrantless search is justified, taking into account the facts and circumstances known to the

- Objective evaluation of facts available to a reasonable officer at the scene, not the 20/20 vision of appellate hindsight;

- Whether the described exigency (destruction of evidence in this case) required prompt and decisive official police action and allowed for no time to secure a warrant;

- Persuasive circumstances of an exigency include natural dissipation of alcohol (although not a per se exigency in every case), procedures in place for obtaining a warrant, availability of a magistrate judge, and practical problems of obtaining a warrant within the time frame that still preserves an opportunity to obtain reliable evidence;

- Whether, under all the facts reasonably available to the officer at the time of the search, it was objectively reasonable for an officer to conclude that, faced with an emergency, taking the time necessary to obtain a warrant before drawing a blood sample would significantly undermine the efficacy of a blood alcohol test; and

- The focus of exigent circumstances analysis in this context is not on the delay attendant to an investigation but on the delay necessary to obtain a warrant.

---

police at the time of the search."). Circumstances that are relevant to an exigency analysis of a warrantless blood draw include the natural dissipation of alcohol from the bloodstream over time, the procedures in place for obtaining a warrant, the availability of a magistrate judge, and the practical problems of obtaining a warrant within a time frame that still preserves the opportunity to obtain reliable evidence. *McNeely*, 569 U.S. at 164, 133 S. Ct. at 1568; *Weems*, 493 S.W.3d at 580.

The record shows that Sanders's request to be transported to the hospital precipitated the emergency medical treatment upon her arrival. The officer's probable cause determination following the HGN test in the emergency room coincided with the efforts of the medical staff to administer medical treatment to Sanders. According to Trooper Neff, there was literally no time to do anything as the staff ushered him out of the emergency room. Based on his education, training, and experience, and believing that the various treatments Sanders would receive would adversely affect and corrupt the blood sample, Trooper Neff asked a nurse to draw a blood sample. The State established sufficient evidence to prove an exigency justifying a warrantless blood draw.

The majority faults Trooper Neff for failing to use available resources to help him secure a warrant despite having an hour and fifteen minutes to do so, and the majority ultimately finds the real reason he did not get a warrant was because he did not believe he needed a warrant in this case. At the outset, I believe this criticism is moot because Trooper Neff had no duty to obtain a warrant prior to his determination of probable cause at the hospital. I will nevertheless address the court's criticisms.

I have serious reservations about the degree of importance which the court attributes to the "availability of other officers" factor. An analysis of this factor must first recognize the admonition of the court in *Cole* that the appellate courts should not yield to the temptation of "pronounc[ing] what law enforcement ideally

should have done in a particular case after all the facts are known . . . [because] hindsight distorts a proper exigency analysis's focus . . . ."[20]

The majority initially states numerous other officers were available to obtain a warrant. It describes how, unlike in the *Cole* case, where numerous officers were knee deep in investigative work and could not be spared from the crash scene, in this case Trooper Russell declared numerous officers and emergency personnel were available, had time on their hands, and were not doing much of anything. But the record shows otherwise; it shows that all officers had ongoing assignments at the crash scene unless reassigned, and it therefore demonstrates this is not a realistic description of the crash scene.

The majority seems to confuse the activity of the investigators at the arrival stage and the execution stage. At the very beginning, the various responders were awaiting leadership and direction of the investigation. This is commonly described as the arrival stage in all substantial undertakings. When Trooper Russell arrived, she took charge as lead investigator, immediately organized the investigation, advised the investigators of their respective assignments, and oversaw the entire scene while they undertook their responsibilities. This is commonly described as the execution stage of the process.[21] Trooper Russell

---

[20] *Cole*, 490 S.W.3d at 925.

[21] The record contains Trooper Russell's testimony that numerous firefighters and emergency medical personnel were drawn to the scene of a two-vehicle, head-on collision which resulted in the deaths of two persons and serious injuries to a third. They had limited responsibilities involving fire, safety, and medical attention and were not involved in personally interviewing and

20

testified as to the specific individual assignments of each of her designated DWI investigators at the scene and elsewhere. Once the investigation got underway, any suggestion that there was a crowd of available officers just standing around, that the scene was a three-ring circus with multiple first responders and investigators acting without much direction or supervision over the course of an hour and fifteen minutes, or that plenty of officers were simply biding their time and could be easily sent to the hospital is contradicted by the record.

The majority stresses that the *Weems* decision held the totality of circumstances militated against finding practical problems prevented the officer from obtaining a warrant and likens the situation to Sanders. This majority misconstrues *Weems*. The court of criminal appeals specifically emphasized that "[o]n this particular record," it was the *continued presence of a second named officer at the hospital* with Weems for two hours that militated against such a finding.[22] In other words, *Weems* did not turn on the general availability of

---

testing Sanders. Trooper Russell, the lead investigator, identified the seven officers involved in the investigation and described the respective responsibilities each was assigned, duties which included such critical tasks as providing medical attention to victims, crowd control, and traffic control; dealing with the suspect; investigating; and collecting evidence. Trooper Russell testified she was busy with her managerial responsibilities and could not take the time to look into the warrant situation, which she had assigned to Trooper Neff. Thus, the majority's statement that help from other officers was in ample supply is quite an exaggeration. During the time at the hospital, there was evidence that all of the officers were carrying out assignments important to the investigation at the crash scene, and there was no evidence that other officers were available when Sanders refused consent for the blood draw at the hospital.

[22]Weems was actually taken to the hospital by two officers who waited two hours for a blood test because the staff was busy. *Weems*, 493 S.W.3d at 582.

21

officers, on hypothetically available officers, or on an available escorting officer but rather on the actual presence of a second assisting officer for several hours at the hospital.[23]  The court of criminal appeals also emphasized that *"[a]nother officer['s] presence or the 'hypothetically available officer' that, in theory, could have secured a warrant in the arresting officer's stead will certainly not render all warrantless blood draws a Fourth Amendment violation, nor do we suggest it is a circumstance that the State must disprove in every case to justify a warrantless search under an exigency theory."*[24]

The majority refers to one particular sentence in *Cole*—"the availability of other officers is a relevant consideration in an exigency analysis"—to underscore the importance of the "availability of other officers," but a statement like this one cannot be lifted out of the record and examined in a vacuum.[25]  Once again, the theme of the *Cole* decision focused on the need to encourage deference to law enforcement decisions in the field and to discourage micromanagement by the judiciary.  In this context, a comment suggesting that a "relevant consideration" is the availability of officers is not particularly remarkable.

---

According to the officers involved, this wait was anticipated and occurred when the officers knew a magistrate was available.  *Id.*  Nevertheless, the officers made no effort to obtain a warrant.  *Id.*

[23] *See id.* at 582.

[24] *Id.*  (emphasis added).

[25] *See Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000).

The *Cole* case involved a horrific crash scene and numerous officers, all of whom, according to the lead investigator, were important to the investigation and dealing with the crisis. At the court of criminal appeals, a dissent filed by Judge Johnson in which Judge Yeary concurred emphasized that two of the officers were actually available if called to secure a warrant. Ultimately, the court of criminal appeals stated that courts should not interfere with "local law-enforcement personnel management decisions and public policing strategy."[26] While the court of appeals had adopted a timeline, an hour-by-hour demonstration of how the officers could have secured a warrant if they had acted immediately, the court of criminal appeals, in contrast, emphasized that such an analytical approach impermissibly viewed law enforcement action through the lens of hindsight and that such temptations should be avoided because the approach overlooks practical problems and considerations which make obtaining a warrant impractical. The court further stated that it disagreed that "an exigency finding cannot be made without the record establishing—and by extension, the State proving—that there was no other officer available to get a warrant in the lead investigator's stead."[27]

The majority in this case relies on a similarly artificial "duty" timeline, stating Trooper Neff had a duty to try to obtain a warrant upon his arrival at the scene (about 12:07 a.m.) which continued over what the court described as an

[26] *Cole*, 490 S.W.3d at 926.

[27] *Id.*

23

excessive period of time (12:07 a.m. to 1:24 a.m.) during which Trooper Neff made no effort to even try to obtain a warrant. The majority's treatment of the artificial timeline is reminiscent of the timeline rejected by the court in *Cole*, the timeline which dictated what law enforcement ideally should have done after all the facts were known with the so-called 20/20 vision of judicial hindsight.

Thus, the *Cole* and *Weems* decisions encouraged courts to afford substantial deference to law enforcement when considering the officer-availability factor. These decisions dictated a flexible, practical, reasonable approach—not a rigid, strict, or literal one—and one in which courts demonstrate substantially more respect for the judgment of law enforcement in the field. Our focus should not be on the numbers per se or mathematical precision. The *Weems* and *Cole* decisions promoted reasonable judgment when courts review various periods of delay, including the hour-and-fifteen-minute time period encountered in this case, during which the officer is actively investigating probable cause. In this respect *Weems* is distinguishable, as the delay in that case was foreseeable and involved two officers, while the time period in this case was only an hour and fifteen minutes when measured from the officer's arrival, and less than that—only moments—when properly measured from the time the officer found probable cause until the time of the imminent and unexpected medical emergency treatment of Sanders.

The majority next emphasizes that when Trooper Neff was about to leave the crash scene to follow the ambulance taking Sanders to the hospital, Trooper

Russell offered to send Deputy Phariss with him to the hospital but Trooper Neff declined the offer. The majority concludes this was a sure sign that Trooper Neff did not seek assistance because he mistakenly believed Texas law did not require a warrant in this case. The majority also concludes that it is a reasonable deduction from this evidence that Trooper Neff did not seek a warrant at the scene because he did not believe a warrant was necessary and, therefore, arbitrarily chose not to seek a warrant.

The record shows Trooper Russell assigned Deputy Phariss to assist her at the crash site, which included helping her paint the scene. Deputy Phariss, therefore, had a specific assignment and was not simply standing around with nothing to do. He certainly did not fall within the court's description of "an officer who was not preoccupied in investigating an accident [and who] was available to pursue a warrant." The offer to send Deputy Phariss to the hospital was made in the context of pulling Deputy Phariss from his assignment and reassigning him to oversee Sanders's boyfriend, who had been interfering with Trooper Neff's investigation at the scene. The record shows the offer was extended to assure an officer's safety and to maintain order at the hospital, but Trooper Neff responded he could take care of the situation. In context, this incident only reflects that Trooper Neff thought he had the safety and order situation under control. It should also be observed that this incident occurred when Trooper Neff was continuing to investigate probable cause and had not yet made this determination.

25

While the court focuses on the number of officers purportedly available, it ignores the element of time. Trooper Neff testified that at the point where Sanders completed the HGN test and refused her consent for a blood draw, Sanders was complaining of pain and nurses were very active in the emergency room, putting up a pole, bringing fluid bags, and setting needles, wipes, blood kits, and similar items on the counter. Trooper Neff realized emergency medical treatment was imminent, which would adversely affect the blood alcohol concentration and thus the blood sample, and that while he had search warrant forms in his pocket, there was no time to fill them out before the medical personnel literally pushed him out of the emergency room. He believed exigent circumstances permitted him to request that a nurse make a blood draw. He did not ask a paramedic at the scene to draw blood. He never requested that a nurse at the hospital draw blood until he concluded the HGN test and made his judgment call that probable cause existed. The nurse took a blood sample about 1:24 a.m. This activity made it clear the hospital staff was ready to treat Sanders and there was absolutely "no time" for any officer, including Trooper Neff, to obtain a warrant for a blood draw. "Warrants inevitably take *some time* for police officers or prosecutors to complete and for magistrate judges to review."[28] Thus, even if other officers had been at the hospital, their presence would add no discernible benefit. It is undisputed that no one at the hospital—not Trooper Neff,

---

[28]*McNeely*, 569 U.S. at 155, 133 S. Ct. at 1562 (emphasis added); *see Weems*, 493 S.W.3d at 582 ("no time to seek out a magistrate").

26

not any other officer had one been present, and not even the justice of the peace—had any time to seek or process a warrant in the face of the necessity for emergency medical treatment of Sanders after Trooper Neff determined probable cause at the hospital. Trooper Neff was presented with a true emergency in this case, the necessity of immediate medical intervention to treat Sanders, which, in Trooper Neff's judgment, presented an exigent circumstance justifying the request for a blood draw; otherwise the testing process would be adversely affected and corrupted.

In addition to the medical emergency, the record shows that Trooper Neff also gave as reasons for not getting a warrant after he found probable cause at the hospital that he was concerned about dissipation of alcohol in the blood stream and did not believe a warrant was necessary. In *McNeely*, the officer gave as his only reason for a warrantless blood draw that he did not believe a warrant was necessary.[29] The officer stopped McNeely for a traffic violation, observed signs of intoxication, performed field sobriety tests at the scene during which he performed poorly, arrested him, took him to the hospital, and immediately asked the nurse to do a blood draw.[30] The record in *McNeely* showed that there was no medical emergency of any kind and that the State did not claim an exigency, whereas in the present case it was undisputed there was

---

[29]569 U.S. at 163, 133 S. Ct. at 1567.

[30]*Id.* at 145–46, 133 S. Ct. at 1556–57.

27

a medical emergency.[31]  In both *McNeely* and Sanders's cases, the officers observed intoxication signs at the scene and intended to perform tests to assist in the probable cause determination.  In *McNeely*, the officer conducted the tests at the scene without any resistance from McNeely[32]; in this case, the HGN test was barely begun at the scene, delayed by Sanders, then completed at the hospital.  McNeely and Sanders performed poorly during testing.[33]  The officer in *McNeely* immediately called for a blood draw, believing no warrant was necessary.[34]  The officer in this case pursued testing at the hospital to establish probable cause; he did not immediately ask for a blood draw at the hospital.  When Trooper Neff faced the emergency medical situation, he emphasized he believed the draw was justified under the exigency exception.  Under these circumstances, Trooper Neff believed his only option to preserve the integrity of the blood draw was to proceed without a warrant.

The majority states it is a reasonable deduction Trooper Neff's mistaken belief was the reason he did not seek a warrant during the entire hour-and-fifteen-minute period.  There is no evidence in the record to support this statement.  While the court does not mention it, I note Trooper Neff's testimony about the reasons for his decision to ask for a blood draw at the hospital, one of

---

[31]*Id.* at 163, 133 S. Ct. at 1567.

[32]*See id.* at 145, 133 S. Ct. at 1556–57.

[33]*Id.*, 133 S. Ct. at 1556–57.

[34]*Id.* at 163, 133 S. Ct. at 1567.

which was his mistaken belief that he did not need a warrant in a fatality accident. The record shows Trooper Neff did not attempt to distance himself from this reason. Instead, he listed it with the other reasons (medical emergency treatment and dissipation of alcohol) explaining why he asked for a blood draw in the final moments before hospital personnel administered emergency treatment. Ironically, this testimony, at least impliedly, along with the balance of Trooper Neff's testimony about his efforts to determine probable cause, contradict the majority's deduction that Trooper Neff's mistaken belief was the reason he did not try to get a warrant at the scene. If we take the opposite tack and assume, for the sake of argument, that Trooper Neff believed a warrant was necessary, the lack of time is equally pronounced, as there was still absolutely no time for Trooper Neff, with or without additional officers, to obtain a warrant before emergency medical treatment was administered to Sanders. Thus, the undisputed and overwhelming evidence in the record shows that the necessity for emergency medical care for Sanders presented an insurmountable challenge and substantially curtailed any opportunity for Trooper Neff to obtain a warrant.

The majority states the record contained no evidence as to the procedures for obtaining a warrant and magistrate availability, two of four relevant factors in an exigency analysis. But the majority does not mention the other two factors applicable to this case: (1) the practical problems of obtaining a warrant within the time frame that still preserves an opportunity to obtain reliable evidence, that is, emergency medical treatment of Sanders afforded Trooper Neff absolutely no

29

time to act, and (2) the natural dissipation of alcohol from the bloodstream over time. The record shows a justice of the peace was present at the crash scene, even if unknown to Trooper Neff, and could have been contacted to obtain a warrant, time permitting. Regardless of the procedures in place or the presence of the magistrate, the undisputed facts show when Trooper Neff believed he had probable cause, that is, sufficient facts to request a blood draw at the hospital, he was also immediately confronted with a medical emergency and in his opinion, he had absolutely no time to seek a warrant and thus believed the exigent circumstances justified the warrantless search.

The record shows Trooper Neff testified that, faced with the necessity of an unforeseen medical emergency, taking the time—any time—to obtain a warrant before drawing a blood sample would have significantly undermined the efficacy of a blood alcohol test. Thus, a practical problem—the medical emergency treatment of Sanders—prevented Trooper Neff from "obtaining a warrant within a time[]frame that still preserve[d] the opportunity to obtain reliable evidence" of Sanders's blood alcohol content.[35]

## CONCLUSION

Under the circumstances of this case, the question is whether probable cause was established under the totality of the facts at the moment of the search by the arresting officer as viewed from the standpoint of the officer. An objective review of the facts shows that probable cause was established by Trooper Neff

---

[35] *Id.* at 164, 133 S. Ct. at 1568.

after he had concluded the HGN test and determined he had sufficient facts to believe Sanders was intoxicated. Trooper Neff had no duty to seek a warrant prior to this determination at the hospital. The circumstances justifying the warrantless blood draw are the dissipation of alcohol and the practical problem presented by the emergency medical treatment of Sanders, which left no time within which to act to obtain a warrant.[36]

In view of the facts and circumstances known to law enforcement at the time, it would be objectively reasonable for Trooper Neff to conclude that taking the time necessary to obtain a warrant before drawing a blood sample would significantly undermine the efficacy of a blood alcohol test. As the court did not reach the issue of whether the State failed to prove the medical intervention at the hospital would destroy or even influence the blood test or that law enforcement reasonably believed obtaining a warrant would undermine the efficacy of the blood test, I do not address that issue at this time.

I respectfully dissent.


/s/ Kerry FitzGerald
KERRY FITZGERALD
JUSTICE

---

[36]Circumstances that are relevant to an exigency analysis of a warrantless blood draw include the natural dissipation of alcohol from the bloodstream over time, the procedures in place for obtaining a warrant, the availability of a magistrate judge, and the practical problems of obtaining a warrant within a time frame that still preserves the opportunity to obtain reliable evidence. *Id.*, 133 S. Ct. at 1568; *Weems*, 493 S.W.3d at 580.

PUBLISH

DELIVERED:  December 14, 2017